**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **MEI'HWA FERGUSON,** *individually and on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>**CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INC., UNITEDHEALTHCARE INC.,** and **OPTUM INC.,**<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mei'hwa Ferguson ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendants Change Healthcare Inc. ("Change"), UnitedHealth Group Inc. ("UnitedHealth Group"), UnitedHealthcare Inc. ("UnitedHealthcare"), and Optum Inc. ("Optum," and collectively with Change, UnitedHealth Group, and UnitedHealthcare, "Defendants") and alleges as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiff.

## NATURE OF CASE

1. This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly-sensitive consumer data of Plaintiff and hundreds of millions of Class Members, as a result of the Defendants' failure to reasonably and adequately secure this highly-sensitive consumer data (the "Data Breach"). At a recent hearing before the United States House of Representatives, Andrew Witty, the CEO of UnitedHealth testified that "maybe a third" of all Americans were impacted by the Data Breach.[1]

[1] Lorenzo Franceschi-Bicchierai, UnitedHealthcare CEO says 'maybe a third' of US citizens were affected by recent hack, TechCrunch, https://techcrunch.com/2024/05/01/united-healthcare-ceo-says-maybe-a-third-of-u-s-citizens-

2. Change is a "health tech giant"[2] and is a subsidiary of UnitedHealth Group's Optum division, providing payment and revenue cycle services, clinical and imaging services, and patient and member engagement services to healthcare providers.[3] Change is the nation's largest healthcare clearing house, processing $1.5 trillion in medical claims annually.[4] Change specializes in moving patient data between doctors' offices and/or insurance companies, including medical bills and records containing Plaintiff's and Class Members' sensitive diagnoses, treatment, and histories that "reveal everything from abortions to mental health disorders to diagnosis of cancer to sexually transmitted infections."[5] During a recent congressional Hearing concerning the Data Breach, U.S. Senator Ron Wyden, stated that Change "processes roughly 15 billion health care transactions annually, and a third of Americans' patient records pass through its digital doors."[6]

3. During the regular course of conducting its daily business, Change acquires, collects, and stores consumers' personal data, including personally identifying information ("PII") and protected health information ("PHI") (collectively, "Private Information").

4. On February 21, 2024, UnitedHealth Group, the nation's largest insurer, filed a Form 8-K with the Securities and Exchange Commission disclosing that Change's systems had

---

were-affected-by-recent-hack/ (May 1, 2024); U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next, https://www.finance.senate.gov/hearings/hacking-americas-health-care-assessing-the-change-healthcare-cyber-attack-and-whats-next (May 1, 2024).

[2] Zach Whittaker, UnitedHealth says Change hackers stole health data on 'substantial proportion of people in America', TechCrunch (Apr. 22, 2024) https://techcrunch.com/2024/04/22/unitedhealth-change-healthcare-hackers-substantial-proportion-americans/.

[3] What We Do, Change Healthcare: Part of Optum, https://www.changehealthcare.com/ (last accessed May 9, 2024).

[4] Crapo Statement at Hearing on Change Healthcare Cyberattack, U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024), https://www.finance.senate.gov/imo/media/doc/0501_crapo_statement.pdf

[5] Wyden Hearing Statement on Change Healthcare Cyberattack and UnitedHealth Group's Response, U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024), https://www.finance.senate.gov/imo/media/doc/0501_wyden_statement.pdf.

[6] *Id.*

been infiltrated by a "suspected nation-state associated cyber security threat actor."[7] Companies, such as UnitedHealth Group, are required to file Form 8-K to announce major events that shareholders should know about.

5. The Form 8-K documented what was later claimed, on February 28, 2024,by the notorious ransomware cybercriminals, known as the BlackCat/ALPHV ransomware group ("BlackCat"), that the Data Breach, was a successful infiltration by BlackCat into Defendants' inadequately protected network allowing access to highly sensitive information, including Private Information, which was being kept unprotected.[8]

6. Reports indicate the attack was carried out as a ransomware attack in which BlackCat accessed multiple terabytes of sensitive health data to secure a $22 million ransom payment from Change, which, upon information and belief, was paid in the Spring of 2024. In a statement made by UnitedHealth Group, BlackCat took files containing Private Information that it says may "cover a substantial proportion of people in America."[9]

7. At a recent Senate hearing, the Data Breach was described as follows: "the Change Healthcare hack is considered by many to be the biggest cybersecurity disruption to health care in American history."[10]

---

[7] UNITED STATES SECURITIES AND EXCHANGE COMMISSION: Form 8-K, UNITEDHEALTH GROUP INCORPORATED (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm

[8] Sergiu Gatlan, Ransomware Gang Claims They Stole 6TB of Change Healthcare Data, BleepingComputer (Feb 28, 2024), https://www.bleepingcomputer.com/news/security/ ransomware-gang-claims-they-stole-6tb-of-change-healthcare-data/.

[9] Zach Whittaker, UnitedHealth says Change hackers stole health data on 'substantial proportion of people in America', TechCrunch (Apr. 22, 2024) https://techcrunch.com/2024/04/22/unitedhealth-change-healthcare-hackers-substantial-proportion-americans/.

[10] , U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024)

8. Although it is still early following the Data Breach and we do not yet know the full extent of the damage, the currently known fallout from the Data Breach has been far-reaching across the healthcare system in the United States, including, *inter alia*, causing severe disruptions to the processing and payments of Plaintiff's and Class Members' claims, the ability to check for eligibility for treatment, and the ability to fill prescriptions in.[11] This has had a devastating impact on patients, like Plaintiff and the other Class Members, with reports of patients "being billed hundreds or more than a thousand dollars for prescriptions that previously were covered by insurance;" and others not being able to fill their prescriptions at all because they simply cannot afford their medications.[12]

9. Defendants are subject to HIPAA's privacy rules as healthcare business associates because they knowingly obtain, collect, and store patient Private Information. Defendants, therefore, have a duty to secure, maintain, protect, and safeguard the Private Information in their possession against unauthorized access and disclosure through reasonable and adequate data security measures. Based on numerous prior cyberattacks exfiltrating highly sensitive healthcare information and resulting ransoms, at the time of the Data Breach, Defendants were well-aware that Private Information is extremely valuable to cybercriminals, which made it highly foreseeable that Defendants, the nation's largest health insurers, would be the target of a cyberattack. As Senator Mike Crapo recently described: "While the February hack on Change was by far the most disruptive cyberattack on the health care industry to date, *it was certainly not the first.* According to a report by the Federal Bureau of Investigation, the health care sector experienced more

---

[11] Outages from Change Healthcare cyberattack causing financial 'mess' for doctors, NBC, https://www.nbcnews.com/news/us-news/outages-change-healthcarecyberattack-causing-financial-mess-doctors-rcna141321 (Mar. 1, 2024).

[12] Marlene Cimons et al., How a health-care cyberattack may affect your prescription drug access, Washington Post, https://www.washingtonpost.com/wellness/2024/ 03/05/change-healthcare-hack-prescriptions-affect/ (Mar. 5, 2024).

ransomware attacks than any other critical infrastructure sector in 2023."[13]

10. Despite their duties under the law to Plaintiff and Class Members to protect and safeguard their Private Information, and the foreseeability of a data breach, Defendants failed to implement reasonable and adequate data security measures, which directly resulted in a Data Breach of "unprecedented magnitude" and significant disruption to the healthcare system across the United States.

11. Indeed, UnitedHealthcare itself had already recently been targeted by cybercriminals who accessed and exfiltrated patients' highly-sensitive information via a UnitedHealthcare broker portal.[14] In a September 1, 2023 statement to affected individuals, UnitedHealthcare stated, "UCH is committed to protecting our members' and brokers' information and maintaining the integrity of our systems."[15] Despite these outward assurances and knowing they were a target of cybercriminals, Defendants continued to fail to adequately safeguard Plaintiff's and Class Members' highly sensitive Private Information that it collected and maintained.

12. Defendants owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their Private Information. Yet, Defendants maintained and shared the Private Information in a negligent and/or reckless manner. In particular, Private Information was maintained on computer systems in a condition vulnerable to cyberattacks that lacked, for example, multi-factor authentication to access.

---

[13] Crapo Statement at Hearing on Change Healthcare Cyberattack, U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024), https://www.finance.senate.gov/imo/media/doc/0501_crapo_statement.pdf (emphasis added)

[14] United Health Care Notification to Affected Individuals of Data Security Incident, https://cms.member.myuhc.com/content/dam/iex/assets/pdf/Jarvis%20Website%20posting%20.pdf (last accessed May 14, 2024)

[15] *Id.*

13. Plaintiff's and Class Members' Private Information was compromised due to Defendants' negligent and/or reckless acts and omissions and Defendants' repeated failure to reasonably and adequately protect Plaintiff's and Class Members' Private Information.

14. Now armed with the Private Information accessed in the Data Breach, cyber criminals can use or sell the Private Information to further harm Plaintiff and Class Members in a variety of ways including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' Private Information to target other phishing and hacking intrusions; using Class Members' Private Information to obtain government benefits; and otherwise assuming Class Members' identities.

15. Beyond the significant medical disruptions already endured by Plaintiff and Class Members affecting their health and safety, as a result of the Data Breach, Plaintiff and Class Members face a substantial risk of imminent harm relating to the exposure and misuse of their Private Information. Plaintiff and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

16. Plaintiff and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private Information, loss of privacy, and/or additional damages as described below.

17. Accordingly, Plaintiff brings this action against Defendants, seeking redress for Defendants' unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) breach of contractual duties owed to third-party beneficiaries; (v)

unjust enrichment; (vi) bailment; and (vii) breach of fiduciary duty.

18. Through these claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including reasonable and adequate improvements to Defendants' data security systems, policies, and practices, the implementation of annual audits reviewing the same, adequate credit monitoring services funded by Defendants, and payment for the costs of repairing damaged credit as a result of the Data Breach.

## THE PARTIES

19. Plaintiff Mei'hwa Ferguson is a natural person, resident, and citizen of the State of Texas.

20. Defendant Change is a Delaware corporation with its principal place of business located at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. Defendant Change is a part of Defendant Optum, and works across the health system to enable information, claims, and payments to flow between physicians, pharmacists, health plans and governments. UnitedHealth Group acquired Change in or around 2022.

21. Defendant UnitedHealth Group is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth Group operates and maintains several offices in Tennessee, including in Brentwood, Lenoir City, Kingston, Maryville, Columbia, Cordova, Smyrna, Gallatin, and Nashville.

22. Defendant UnitedHealthcare is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealthcare is the insurance benefits arm of Defendant UnitedHealth Group.

23. Defendant Optum is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota. Optum "delivers care aided by technology and

data, empowering people, partners and providers with the guidance and tools they need to achieve better health."[16] UnitedHealth Group acquired Optum in or around 2011.

## JURISDICTION AND VENUE

24. This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff, and at least one member of the putative Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

25. This Court has general personal jurisdiction over Defendants because Defendant Change has its principal place of business in this district, and all Defendants operate in and direct commerce at this District.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Change's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members residing in this District.

## DEFENDANTS' BUSINESSES

27. UnitedHealth Group is the largest healthcare insurer in the United States, and the fifth largest company in the United States.[17] Overall, UnitedHealth Group reaches 152 million individuals across all arms of its business, from insurance, to physician practices, to home health and pharmacy. In 2023 alone, UnitedHealth Group generated $324 billion in revenue.[18]

28. Plaintiff and Class Members are former or current patients and consumers who

---

[16] Optum: Technology and data-enabled care delivery, UnitedHealth Group, https://www.unitedhealthgroup.com/people-and-businesses/businesses/optum.html (last accessed May 9, 2024).
[17] Wyden Hearing Statement on Change Healthcare Cyberattack and UnitedHealth Group's Response, U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024), https://www.finance.senate.gov/imo/media/doc/0501_wyden_statement.pdf.
[18] *Id.*

used Defendants' services.

29. In the course of facilitating insurance and other transactions related to Plaintiff's and Class Members' healthcare, Defendants receive, create, and handle patient Private Information. Indeed, to receive services from Defendants, Plaintiff and Class Members were required to provide highly sensitive Private Information, including some or all of the following:

- Full names and addresses;
- Personal email addresses and phone numbers;
- Dates of Birth;
- Social Security Numbers;
- Driver's Licenses (or other similar state identifications);
- Health insurance information;
- Health information including but not limited to information about diagnosis and treatment, personal medical history, family medical history, mental health information, information related to STDs and treatment, information related to abortions, medication information, and medical record numbers;
- Information about physicians and related medical professionals who had been involved in previous or ongoing treatment of the patient;
- Billing and claims information including but not limited to information related to credit and debit card numbers, bank account statements and account numbers, and insurance payment details;
- Medicare/Medicaid information;
- Medication information;
- Diagnostic results and treatment information.

30. This sort of Private Information is extremely sensitive and is extremely valuable to criminals because it can be used to commit serious identity and medical identity theft crimes.

31. Because of the highly sensitive and personal nature of the information Defendants acquire, store, and transfer with respect to consumers and other individuals, Defendants, upon information and belief, promise to, among other things: keep Private Information private; comply with healthcare industry standards related to data security and Private Information, including FTC guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiff and Class Members obtain from Defendants and provide adequate notice to individuals if their Private Information is disclosed without authorization.

32. As HIPAA covered business entities, as discussed *infra*, Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing the requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI, as in the case of the Data Breach complained of herein.

33. However, despite the existence of these duties, Defendants did not maintain adequate security to protect their systems from infiltration by cybercriminals, resulting in a massive disruption to the U.S. healthcare system, including to patients' access to vital medication, and the enabling of cybercriminals to access and compromise Plaintiff's and Class Members' Private Information.

34. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties owed to Plaintiff

and Class Members and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

35. Yet, contrary to Defendants' representations, Defendants failed to implement adequate data security measures, as evidenced by Defendants' admission of the Data Breach, which affected, by some estimates, one-third of all Americans.[19]

**Defendants are Covered Entities Subject to HIPAA**

36. Defendants are "business associates" of healthcare providers and covered entities under HIPAA, each of whom provide healthcare, medication, and insurance related services to hundreds of millions of patients annually either directly or via their healthcare clients. As a regular and necessary part of their businesses, Defendants collect, store, and transfer the highly sensitive Private Information of patients.

37. As covered entities, Defendants are required under federal and state law to maintain the strictest confidentiality of the Private Information they acquire, receive, collect, transfer, and store. Defendants are further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

38. Due to the nature of Defendants' businesses, which includes providing a range of revenue cycle, insurance, technology, and financial services to healthcare clients, including obtaining, storing, and maintaining electronic health and medical records, Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information they know and understand to be sensitive and confidential.

39. In fact, whenever Defendants contract with covered entities (healthcare providers) to provide various business and medical services, HIPAA requires that these contracts mandate

[19] Testimony of Andrew Witty Chief during the U.S. Senate Committee on Finance, Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next (May 1, 2024).

that Defendants will use adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing the HIPAA Security Rule[20] and immediately reporting any unauthorized use or disclosure of PHI (such as the Data Breach) to affected covered entities.

40. For its part, Defendant Change explicitly touts its "Commitment to Compliance," claiming that it "provides assurance to our customers that applicable Change Healthcare products and services meet or exceed regulatory requirements."[21]

41. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

42. Plaintiff and Class Members are or were patients, or executors or surviving spouses of patients, whose Private Information was maintained by Defendants and directly or indirectly entrusted Defendants with their Private Information.

43. Plaintiff and Class Members relied on Defendants to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and healthcare purposes, and to prevent unauthorized disclosures of Private Information. Plaintiff and Class Members reasonably expected that Defendants would safeguard and keep their Private Information confidential.

44. As described throughout this Complaint, Defendants failed to reasonably and

[20] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. See 45 C.F.R. Part 160 and Part 164, Subparts A and C

[21] HIPAA Simplified, Change Healthcare, https://support.changehealthcare.com/customer-resources/hipaa-simplified (last accessed May 7, 2024).

adequately protect, secure, and/or store Plaintiff's and Class Members' Private Information prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures they knew or should have known were insufficient to reasonably protect the highly sensitive Private Information that they maintained. Consequently, cybercriminals circumvented Defendants' security measures, resulting in a significant Data Breach.

**<u>The Data Breach of Defendants' Systems</u>**

45. Beginning on or around February 21, 2024, the notorious BlackCat ransomware group exploited the Defendants' failure to adequately and reasonably safeguard their data systems, and accessed, copied, and stole Plaintiff's and Class Members' Private Information that was processed and stored on Defendant Change's servers and networks.

46. In an online notice published to its website, on or around February 21, 2024 (the "Online Notice"), Defendant Change, reported the following update:

> **Update** - Change Healthcare is experiencing a network interruption related to a cyber security issue and our experts are working to address the matter. Once we became aware of the outside threat, in the interest of protecting our partners and patients, we took immediate action to disconnect our systems to prevent further impact. The disruption is expected to last at least through the day. We will provide updates as more information becomes available.[22]

47. On or around February 29, 2024, Defendant Change updated its Online Notice with the following information:

> **Update** – Change Healthcare can confirm we are experiencing a cybersecurity issue perpetrated by a cybercrime threat actor who has represented itself to us as ALPHV/Blackcat. Our experts are working to address the matter and we are working closely with law enforcement and leading third-party consultants, Mandiant and Palo Alto Network, on this attack against Change Healthcare's systems.
>
> We are actively working to understand the impact to members, patients and customers. Patient care is our top priority, and we have multiple workarounds to ensure people have

[22] https://status.changehealthcare.com/. Although the initial notice posted is no longer active, a WayBack Machine archive version is accessible here: https://web.archive.org/web/20240301000723/https://status.changehealthcare.com/ (last accessed May 9, 2024).

> access to the medications and the care they need. Based on our ongoing investigation, there's no indication that Optum, UnitedHealthcare and UnitedHealth Group systems have been affected by this issue.
>
> We are working on multiple approaches to restore the impacted environment and continue to be proactive and aggressive with all our systems, and if we suspect any issue with the system, we will immediately take action.[23]

48. Omitted from the Online Notice is information explaining the root cause of the Data Breach, the vulnerabilities BlackCat exploited, UnitedHealthcare's prior data breach, and the new remedial measures undertaken to ensure similar breaches do not continue to occur exposing customers' Private Information. To date, these omitted details have not been explained or revealed to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is not repeatedly exposed to cybercriminals by Defendants.

49. Upon information and belief, the ransomware group BlackCat specifically targeted Defendants based on their status as healthcare entities with enormous amounts of valuable Private Information—including the Private Information of Plaintiff and Class Members.

50. In response to the Data Breach, Defendants paid BlackCat a ransom of 350 bitcoins or roughly $22 million, on March 1, 2024.[24] It remains unclear to Plaintiff and Class Members what the payment was for as, according to technology reporters, despite payment of that ransom, Defendants "still face[] the risk of losing vast amounts of customers' sensitive medical data."[25]

51. Plaintiff further believes that her and Class Members' Private Information has been or soon will be disseminated on the dark web, to be available for purchase, because that is the

---

[23] *Id.*

[24] Andy Greenberg, Change Healthcare Finally Admits IT Paid Ransomware Hackers $22 Million—and Still Faces a Patient Data Leak, Wired (Apr. 22, 2024) https://www.wired.com/story/change-healthcare-admits-it-paid-ransomware-hackers/#:~:text=11%3A55%20PM-,Change%20Healthcare%20Finally%20Admits%20It%20Paid%20Ransomware%20Hackers%20%2422%20Million,up%20on%20the%20dark%20web.

[25] *Id.*

*modus operandi* of cybercriminals like the BlackCat group. Indeed, Wired recently reported that "a conflict between hackers in the ransomware ecosystem has led to a *second* ransomware group claiming to possess Change Healthcare's stolen data and threatening to sell it to the highest bidder on the dark web."[26]

52. As HIPAA covered business entities that collect, create, transfer, and maintain significant volumes of Private Information, the targeted attack was a foreseeable risk which Defendants were aware of, had previously and recently been affected by, and knew they had a duty to guard against. It is well-known that healthcare providers and their business associates, such as Defendants, which collect and store confidential and sensitive Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

53. The U.S. Department of Health and Human Services ("HHS") and the Office of Consumer Rights urges HIPAA entities to encrypt data containing sensitive personal information. In an effort to underscore the necessity of doing so to protect consumers' data, as far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated that "[o]ur message to these organizations is simple: *encryption is your best defense against these incidents*." Despite these fines and warnings, Defendants failed to encrypt Plaintiff's and Class Members' Private Information as recommended.

54. The Data Breach was a targeted cyberattack expressly designed to gain access to

[26] *Id.*

and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiff and Class Members.

55. Defendants had obligations created by HIPAA, contract, industry standards, common law, and their own promises and representations made to Plaintiff and Class Members following the December 2022 data breach of UnitedHealthcare's data systems to keep their Private Information confidential and protected from unauthorized access and disclosure.

56. Plaintiff and Class Members (or their doctors and healthcare providers) entrusted Defendants with their Private Information with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

57. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew, or should have known, they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

58. Due to Defendants' inadequate security measures and their delayed notice to victims, Plaintiff and Class Members were unable to obtain necessary health services and prescriptions affecting their health and wellbeing and now also face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

**The Data Breach was a Foreseeable Risk of which Defendants Were on Notice**

59. As HIPAA-covered entities handling Private Information, Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the Data Breach.

60. At all relevant times, Defendants knew, or should have known that Plaintiff's and Class Members' Private Information was a target for malicious actors. As set forth *supra*, Defendants were recently the target of such an attack by malicious attackers and, subsequently, vowed to take the necessary and "immediate" steps to protect and safeguard the Private Information of Plaintiff and Class Members. Yet, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that Defendants knew directly about and should have guarded against.

61. In addition to Defendants' own experience with a cyberattack in December 2022, Defendants knew or should have known from healthcare industry reports and studies identifying that cybercriminals target institutions which collect and store PHI at a greater rate than other sources of personal information. For example, in a 2022 report, the healthcare compliance company, Protenus, found that there were at least 905 health data breaches in 2021 alone, impacting over 50 million patients. The report noted that "the volume and impact of breaches continue to be underreported overall, and underrepresented to the public[,]" stressing that "gaps in detection and reporting mean the true impact of incidents is likely even greater."[27]

62. The healthcare sector suffered at least 337 data breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare data breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported

---

[27] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/hubfs/Breach_Barometer/BreachBarometer_Privacy_2022_Protenus.pdf?utm_campaign=Forbes%2520Articles&utm_source=forbes&utm_medium=article&utm_content=breach%2520barometer (last visited Dec. 11, 2023).

incidents.[28]

63. In light of the Defendants' own recent cybersecurity data breach and other high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8.8 patients, March 2023), Shields Health Care Group (2 million patients, March 2022), Broward Health (1.3 million patients, January 2022), OneTouchPoint (2.6 million patients, July 2022), Trinity Health (3.3 million patients, May 2020), and American Medical Collection Agency (25 million patients, March 2019) Defendants knew or should have known their electronic records would be targeted by cybercriminals.

64. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[29] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[30] A study by Experian found that the "average total cost" of medical identity theft was "about $20,000" per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[31]

65. In fact, according to the cybersecurity firm Mimecast, 90 percent of healthcare

---

[28] *See* Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, HEALTH IT SECURITY: CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[29] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[30] *Id.*

[31] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

organizations experienced cyberattacks in 2020.[32]

66. Cyberattacks on medical systems have become so common that in 2019 the FBI and U.S. Secret Service issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[33]

67. This was not the FBI's first warning to the healthcare industry about the threat of cyberattacks. Indeed, cyberattacks against the healthcare industry have been common for over a decade, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII[.]" The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[34] Later, in August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

68. According to an article in the HIPAA Journal posted on November 2, 2023, cybercriminals hack into medical practices for their highly prized medical records. "[T]he number

---

[32] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[33] *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[34] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights (OCR)] – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[35]

69. According to the HIPAA Journal's 2023 Healthcare Data Breach Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[36]

70. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[37] In this case, Defendants failed to reasonably and adequately protect the stored records of *hundreds of millions* of patients—roughly one-third of all Americans.

71. Private Information, like that stolen from Defendants, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for

---

[35] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[36] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[37] *See id*.

considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[38]

72. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; *it's a patient safety issue*. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that *cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.*[39]

73. The Data Breach resulting in the theft of Plaintiff's and Class Members' Private Information poses a known patient safety issue, including the interruption of important medical services.

74. Given Defendants' own recent experience with a data breach and the wealth of information from the law enforcement and healthcare industry concerning the increasing prevalence of cyberattacks, Defendants knew and should have known about its data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiff's and Class Members' Private Information. Knowing the risk, Defendants failed to do so.

**Defendants Failure to Comply with FTC Guidelines**

75. The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, including HIPAA entities, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all

---

[38] *See id.*

[39] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

business decision-making.

76. For example, in 2016, the FTC updated its published guidelines, *Protecting Personal Information: A Guide for Business*, which laid out standard and accepted cyber-security measures for businesses to implement to protect consumers' private data. The guidelines advise businesses, *inter alia*, to: encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[40]

77. The FTC's guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to require complex passwords to be used on networks; to use industry-tested methods for security; to monitor for suspicious activity on the network; and to verify that third-party service providers have implemented reasonable security measures.[41]

78. To underscore the binding significance of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, pursuant to Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further identify the measures businesses *must* take to meet their data security obligations consistent with federal law.

79. These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[40] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[41] *Id.*

80. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

81. Defendants were at all times fully aware of their obligations to protect the Private Information of customers and patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**Defendants Failure to Comply with Accepted Industry Standards for Data Security**

82. In light of the evident threat of cyberattacks seeking consumers' Private Information, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by healthcare service providers like Defendants to secure Plaintiff's and Class Members' Private Information, including but not limited to: educating and training all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; monitoring and limiting the network ports; protecting web browsers and email management systems; and limiting which employees can access sensitive data.

83. On information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

84. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby

opening the door to and causing the Data Breach.

**<u>Defendants' Failure to Comply with Their HIPAA Obligations to Safeguard Private Information</u>**

85. As healthcare service providers handling medical patient data and providing services to hospitals and healthcare organizations, Defendants are covered entities under HIPAA (45 C.F.R. § 160.103) and are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

86. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

87. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

88. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

89. HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. These safeguards include physical, technical, and administrative components.

90. The Data Breach is considered a breach under the HIPAA Rules because it involved an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or

privacy of the PHI." *See* 45 C.F.R. 164.40

91. The Data Breach resulted from a combination of multiple failures by the Defendants to adequately and reasonably secure the Plaintiff's and Class Members' Private Information in violation of the mandates set forth in HIPAA's regulations.

**Defendants Failure to Adequately and Reasonably Secure Plaintiff's and Class Members' Private Information has Increased Their Risk of Fraud and Identity Theft**

92. Cyberattacks and data breaches at healthcare service providers like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

93. Researchers have found that, among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[42]

94. Researchers have further found that for medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness of care and patient outcomes.[43]

95. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[44]

---

[42] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[43] *See* Sung J. Choi, et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[44] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are

96. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

97. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

98. Identity thieves use stolen Private Information such as Social Security numbers for

---

Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

[45] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Dec. 11, 2023).

a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

99. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

100. Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[46]

101. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

102. It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

103. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from

[46] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

data breaches cannot necessarily rule out all future harm.

GAO Report at 29.

104. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

105. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

106. Private Information can sell for as much as $363 per record according to the Infosec Institute.[47] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

107. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[48] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[49] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's

---

[47] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[48] *Identity Theft and Your Social Security Number*, Social Security Administration (July 2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

[49] *Id.*

employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

108. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

109. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[50]

110. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[51]

111. Medical information is especially valuable to identity thieves.

112. Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[52]

113. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and

[50] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[51] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[52] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 11, 2023).

other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

114. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

115. For this reason, Defendants knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Defendants were on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendants failed to properly prepare for that risk.

**Defendants' Failure to Adequately and Reasonably Protect Against The Data Breach was Reckless and Negligent**

116. Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data to protect and safeguard stored Private Information. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' and customers' Private Information;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

e. Failing to train their employees in the proper handling of emails containing

Private Information and maintain adequate email security practices;

f. Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l. Failing to ensure compliance with HIPAA security standard rules by their workforces in violation of 45 C.F.R. § 164.306(a)(4);

m. Failing to train all members of their workforces effectively on the policies

and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n. Failing to render the electronic Private Information they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p. Failing to adhere to industry standards for cybersecurity as discussed above; and

q. Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

117. Defendants negligently, recklessly, and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access Defendants' computer network and systems which contained unsecured and unencrypted Private Information for multiple days.

118. Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants.

**Plaintiff's and Class Members' Damages**

119. Given the sensitivity of the Private Information involved in this Data Breach, Plaintiff and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendants have done nothing to compensate Plaintiff or Class Members for many of the injuries they have already suffered. Defendants have not demonstrated any efforts to prevent additional harm from befalling Plaintiff and Class Members as a result of the Data Breach.

120. Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach, which is now in the hands of cybercriminals.

121. Plaintiff and other Class Members have also been damaged by medical disruptions resulting from the Data Breach which rendered Plaintiff and other Class Members unable to access vital prescription medications and other healthcare services.

122. Since being notified of the Data Breach, Plaintiff has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to time with her family, work and/or recreation.

123. Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

124. Plaintiff's and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

125. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of

harm from fraud and identity theft.

126. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

127. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

128. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

129. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

130. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

131. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiff and Class Members paid to Defendants and/or Defendants' healthcare partners was intended to be used by Defendants to fund adequate security of their computer system(s) and Plaintiff's and Class Members' Private Information. Thus, Plaintiff and Class Members did not get what they paid for and agreed to.

132. Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

133. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

134. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

135. Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer from, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

136. Moreover, the magnitude of harm arising from this Data Breach is greater in kind and extent than harm resulting from other Data Breaches in the healthcare sector, owing to the fact that Plaintiff and Class Members suffered injuries beyond those arising from the theft of their Private Information. Specifically, Plaintiff and Class Members suffered harm from increased out-of-pocket expenses to obtain medical services and prescriptions, being unable to fill their prescriptions entirely, and/or not being able to apply discount coupons to afford their medications or healthcare services.

137. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

**<u>Plaintiff's and Class Members Experiences</u>**

138. To use Defendants' services, Plaintiff—like other Class Members—provided sensitive Private Information including her full name, address, date of birth, Social Security number, medical records, insurance information, billing, banking, and credit card information, family medical history, and more either to Defendants directly or to their healthcare providers or pharmacies to provide to Defendants.

139. Defendants obtained and continue to store and maintain Plaintiff's and Class Members' Private Information. Defendants owe Plaintiff a legal duty and obligation to protect her

Private Information from unauthorized access and disclosure. Plaintiff's Private Information was compromised and disclosed as a result of Defendants' inadequate data security practices, which resulted in the Data Breach.

140. Over two months after the Data Breach, Defendants have yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: patient name and contact information including mail address, email address, and phone number; state and/or federal identification; Social Security number; health insurance information including healthcare cards; date of birth; medical information including information related to medical history, diagnosis, and treatment; information about treating physicians and medical professionals; billing and claims information including payment details, medication and prescription history; mental health information, contact information for family members; including full names, personal relationship, and phone number; Medicare/Medicaid information; workers comp. or employment related information; and more.

141. As a direct result of the data breach, Plaintiff had issues attempting to purchase her prescription medication this month at multiple pharmacies due to the Data Breach. Because of the Data Breach, Plaintiff Ferguson was unable to use her prescription savings card and could not pay out of pocket for medication she needed because the $1,400 out-of-pocket cost for the medication was beyond her financial means and would have caused significant financial hardship for her. This resulted in a disruption to Plaintiff Ferguson's medical dosing schedule for over a month. In other words, the Data Breach directly caused Plaintiff to be unable to access her critical prescription medication, which she otherwise would have been able to obtain but for the Data Breach.

142. Plaintiff is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents.

Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts.

143. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit.

144. Plaintiff was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to time with her family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

145. Plaintiff suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) loss of access to medications and/or treatment; (h) failure to receive the benefit of her bargain; and (i) nominal and statutory damages.

146. Plaintiff has also suffered emotional distress that is proportional to her inability to access critical medications, as well as to risk of harm and loss of privacy caused by the theft of her Private Information which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private

Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her Social Security number, medical records, and prescriptions.

147. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

148. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

149. Plaintiff brings this action against Defendants individually and on behalf of all other persons similarly situated.

150. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendants identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Class").**

151. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

152. Plaintiff reserves the right to amend or modify the Class or Subclass definition or create additional subclasses as this case progresses.

153. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The CEO of Defendant UnitedHealth Group, Andrew Witty, estimates that as many as *one-third of all Americans* may have been impacted by the Data Breach.

154. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Plaintiff and Class Members to safeguard their Private Information;

g. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h. Whether Defendants should have discovered the Data Breach sooner;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Defendants' conduct was negligent;

k. Whether Defendants breached implied contracts with Plaintiff and Class Members;

l. Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. Whether Defendants failed to provide notice of the Data Breach in a timely manner, and;

n. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

155. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

156. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

157. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the data of Plaintiff and Class Members was stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

158. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

159. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Classwide basis.

160. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the public of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable and adequate in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures

amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

161. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to names and addresses of Class Members' affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence and Negligence Per Se**
**(*On Behalf of Plaintiff and the Class*)**

162. Plaintiff re-alleges and incorporates by reference factual allegations above as if fully set forth herein.

163. By collecting and storing the Private Information of Plaintiff and Class Members, in their computer systems and networks, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

164. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

165. Plaintiff and Class Members are a well-defined, foreseeable, and probable group of patients that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

166. Defendants' duty of care to use reasonable and adequate security measures arose as a result of the special relationship that existed between Defendants and consumers, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

167. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

168. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

169. Defendants' duty to use reasonable care in protecting confidential data arose not

only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

170. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to ensure that their email systems had reasonable data security safeguards in place;

d. Failing to have in place reasonable and adequate mitigation policies and procedures;

e. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

f. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

g. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

171. Plaintiff and Class Members have no ability to protect their Private Information that was or remains in Defendants' possession.

172. It was foreseeable that Defendants' failure to use reasonable measures to protect

Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the prior breach of Defendants' own data systems, the known high frequency of cyberattacks and data breaches in the healthcare industry.

173. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members.

174. Defendants' conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information, and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

175. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

176. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

177. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

178. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and

Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

**COUNT II**
**Breach of Implied Contract**
***(On behalf of Plaintiff and the Class)***

179. Plaintiff re-alleges and incorporates by reference factual allegations above as if fully set forth herein.

180. Defendants acquired and maintained the Private Information of Plaintiff and the Class that they received either directly or from their healthcare providers.

181. When Plaintiff and Class Members paid money and provided their Private Information to their doctors and/or healthcare providers, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with their doctors and/or healthcare professionals, their business associates, revenue service providers, and file transfer software providers, including Defendants.

182. Plaintiff and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

183. Plaintiff and the Class were required to deliver their Private Information to Defendants as part of the process of obtaining services provided by Defendants. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

184. Defendants directly or indirectly solicited, offered, and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants offers and provided their Private Information to Defendants or, alternatively, provided their information to doctors or other healthcare professionals, who then

provided it to Defendants.

185. Defendants accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members and/or their doctors and other healthcare professionals.

186. In accepting such information and payment for services, Defendants entered into implied contracts with Plaintiff and Class Members whereby Defendants became obligated to reasonably safeguard Plaintiff's and Class Members' Private Information.

187. Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between Defendants and healthcare providers.

188. In delivering, directly or indirectly, their Private Information to Defendants and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

189. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

190. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of their agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data

breaches.

191. Plaintiff and Class Members (or their doctors and healthcare providers) would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

192. Had Defendants disclosed to Plaintiff and Class Members (or their doctors and healthcare providers) that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members (or their doctors and healthcare providers) would not have provided their Private Information to Defendants.

193. Defendants recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and Class Members (or their doctors and healthcare providers).

194. Plaintiff and Class Members (or their doctors and healthcare providers) fully performed their obligations under the implied contracts with Defendants.

195. Defendants breached the implied contracts with Plaintiff and Class Members (or their doctors and healthcare providers) by failing to take reasonable and adequate measures to safeguard their Private Information as described herein.

196. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III
**Breach of Contractual Duties Owed to Third-Party Beneficiaries**
***(On Behalf of Plaintiff and the Class)***

197. Plaintiff incorporates and realleges all factual allegations above as if fully set forth herein.

198. Defendants entered into a contract to provide services to Plaintiff's respective medical providers and/or insurance companies. Upon information and belief, this contract is

virtually identical to the contracts entered into between Defendants and their other medical provider and insurance customers around the country whose patients were also affected by the Data Breach.

199. These contracts were made expressly for the benefit of Plaintiff and the Class, as it was their confidential medical information that Defendants agreed to collect and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties.

200. Defendants knew that if they were to breach these contracts with their customers, the customers' patients, including Plaintiff and the Class, would be harmed by, among other harms, fraudulent transactions.

201. Defendants breached their contracts with the medical providers and/or insurance entities affected by this Data Breach when they failed to use reasonable data security measures that could have prevented the Data Breach.

202. As foreseen, Plaintiff and the Class were harmed by Defendants' failure to use reasonable security measures to store patient information, including but not limited to the risk of harm through the loss of their Private Information, increased out-of-pocket medical expenses, and loss of access to medications and/or healthcare treatment and other services.

203. Accordingly, Plaintiff and the Class are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT IV
**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

204. Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

205. This count is pleaded in the alternative to the breach of contract claims (Counts II and III).

206. Upon information and belief, Defendants fund any data security measures they implement entirely from their general revenue, including from money they make based upon representations of protecting Plaintiff's and Class Members' Private Information.

207. There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiff's and Class Members' Private Information confidential and protected.

208. Plaintiff and Class Members paid Defendants and/or healthcare providers a certain sum of money, which was used to fund any data security measures implemented by Defendants via contracts with Defendants.

209. As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

210. Protecting the Private Information of Plaintiff and Class Members is integral to Defendants' businesses. Without their data, Defendants would be unable to provide the insurance, technology, and healthcare-related services to hospital and healthcare providers comprising Defendants' core business.

211. Plaintiff's and Class Members' data and Private Information has monetary value.

212. Plaintiff and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit on Defendants by purchasing goods and/or services from entities that contracted with Defendants, and from which Defendants received compensation to protect certain data. Plaintiff and Class Members directly conferred a monetary benefit on Defendants by supplying Private Information, which has value, from which value

Defendants derive their business value, and which should have been protected with adequate data security.

213. Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

214. Defendants enriched themselves by saving the costs they reasonably should have expended on adequate data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable and adequate level of security that would have prevented the Data Breach, Defendants instead chose to shirk their data security obligations to increase profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures. Plaintiff and Class Members suffered as a direct and proximate result of Defendants' calculated failures to provide the requisite reasonable and adequate data security.

215. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement reasonable and adequate data management and security measures that are mandated by federal law and industry standards.

216. Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

217. If Plaintiff and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants (or to their physician to provide to Defendants).

218. Plaintiff and Class Members have no adequate remedy at law.

219. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

220. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

221. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

**COUNT V**
**Bailment**
**(*On Behalf of Plaintiff and the Class*)**

222. Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

223. Plaintiff and Class Members provided Private Information to Defendants—either directly or through healthcare providers and their business associates—which Defendants were under a duty to keep private and confidential.

224. Plaintiff's and Class Members' Private Information is personal property, and was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

225. Plaintiff's and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendants were aware of the risks they took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

226. Once Defendants accepted Plaintiff's and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiff nor Class Members could control that information once it was within the possession, custody, and control of Defendants.

227. Defendants did not safeguard Plaintiff's or Class Members' Private Information when they failed to adopt and implement reasonable and adequate data security safeguards to prevent the known risk of a cyberattack.

228. Defendants' failure to safeguard Plaintiff's and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

229. As a result of Defendants' failure to keep Plaintiff's and Class Members' Private

Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

**COUNT VI**
**Breach of Fiduciary Duty**
***(On Behalf of Plaintiff and the Class)***

230. Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

231. In light of the special relationship between Defendants and Plaintiff and Class Members, Defendants became fiduciaries by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants do store.

232. Defendants had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship with patients (or the patients of their healthcare clients), in particular, to keep secure their Private Information.

233. Defendants breached their fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

234. Defendants breached their fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

235. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii)

out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendants' services they received.

236. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with

specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e) Ordering Defendants to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) Pre- and post-judgment interest on any amounts awarded; and,

i) Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: May 16, 2024

Respectfully submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV, BPR 23045
Grayson Wells BPR 039658
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

James J. Pizzirusso*
Nicholas Murphy*
Mandy Boltax*
**HAUSFELD LLP**

888 16th Street, N.W., Suite 300
Washington, D.C. 20006
(202) 540-7200
jpizzirusso@hausfeld.com
nmurphy@hausfeld.com
mboltax@hausfeld.com

Steven M. Nathan*
Ashley Crooks*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com
acrooks@hausfeld.com

***Counsel for Plaintiff***

****Pro Hac Vice Forthcoming***